# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

VOLANTA HARRIS-MITCHELL,

    *Plaintiff,*

vs.

                                      Case No. 20-2617-EFM

DAVID S. FERRIERO, in his official
capacity as Archivist of the United States,
National Archives and Records
Administration,

    *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Volanta Harris-Mitchell is an employee of the United States National Archives and Records Administration ("NARA"). In the present action under Title VII of the Civil Rights Act of 1964,[1] Plaintiff alleges Defendant David S. Ferriero, Archivist of the United States and NARA: (1) created a racially hostile working environment; (2) subjected her to illegal retaliation; (3) discriminated against her on the basis of her race and sex in relation to mentoring, job posting, and work evaluation; and (4) discriminated against her on the basis of race in denying her a promotion. Defendant has moved for summary judgment (Doc. 87). For the reasons explained in the present Order, the Court grants Defendant's motion.

---

[1] 42 U.S.C. § 2000e *et seq.*

## I.        Factual and Procedural Background[2]

Plaintiff, an African-American, is employed by NARA as Supervisory Archives Specialist (GS-9) at the Federal Records Center ("FRC") in Lenexa, Kansas.  She has held the position for 21 years.  Plaintiff has 32 years work experience in NARA's General Reference section.

Plaintiff's current supervisor at the Lenexa FRC is Deputy Director Karl Kornmueller.

David Diamond, who is white, is the Director of the Lenexa FRC. He has served as Plaintiff's first-line and second-line supervisor.

Rose Parisse is a former Director at Lenexa, and worked for NARA for approximately 40 years.  Parisse supervised Plaintiff from 1990 to 2013.

Defendant is an employer within the meaning of Title VII.  Defendant's employees are required to complete annual training regarding discrimination, harassment, and retaliation, including the process and requirements for pursuing an Equal Employment Opportunity ("EEO") complaint.

Plaintiff filed the present action after she failed to obtain two positions at NARA in 2018. Before seeking those promotions, Plaintiff had advanced a number of complaints regarding her employment at NARA.  On May 30, 2013, Plaintiff filed a complaint with the NARA EEO office complaining of discrimination based on her race, color, and sex, which was designated as Administrative Case No. 1319LX.

After receiving a reduced rating of "Highly Successful" on her 2013 performance appraisal, Plaintiff filed another complaint (Case No. 1410LX), alleging discrimination based on race, color, sex, age, and reprisal.

---

[2]  In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

On July 18, 2016, Plaintiff filed a third complaint (Case No. 1638LX), alleging discrimination based on race, color, sex, age, and reprisal when she was not selected for a Supervisory Archives Specialist GS 11/12 position, under Job Announcement No. JD1630649TPM.

On March 27, 2018, Plaintiff contacted the NARA EEO office alleging discrimination based on race, color, age, sex, and reprisal.  She filed a formal complaint on May 23, 2018, which was accepted by NARA as Administrative Case No. 1822LX.

### A.    Vacancy -395

On May 3, 2018, a GS-11/GS-12 Supervisory Archives Specialist position in Lenexa, KS was posted as Job Announcement No. JD10200395CJM. Plaintiff applied for the job and was included on the certificate of eligibles.

David Diamond was the selecting official for the Job Announcement, and accordingly chose the three-person interview panel for the job:  Kansas City FRC Director Theresa Mellon, Boston FRC Director Jonathan Morse, and Fort Worth FRC Assistant Director Carl Chatman. Mellon and Morse are white; Chatman is African-American. Interviews were conducted telephonically.  Pursuant to NARA standard practice, each panel member created notes on a form entitled "Structured Interview Guide" which was given to the Selecting Official for review.  In selecting the panelists, Diamond did not consider that Mellon, among others, had been named in one of Plaintiff's prior administrative complaints.

Plaintiff contends that deposition testimony from Diamond shows that panelists may sometimes engage in a back-and-forth discussion about the applicants after the interview.  But in the cited testimony, Diamond is asked about the "consensus score," and responds that this is produced because "you are going to have some variations in numbers."  He indicates that there

may be "some talk and collaboration" among the panel, but his testimony does not indicate that such discussions occur always or even often.

In any event, it is uncontroverted that the panelists ultimately offer their own *individual* ratings for each interviewee's experience or performance across seven competencies, including "prior background experience, interpersonal skills, managing human resources, leads teams, leverages diversity, professional credibility, and oral communication."

Mellon created notes regarding the panel's interview of both Plaintiff and the ultimate selectee, Karl Kornmueller.

Mellon individually rated Plaintiff and Mr. Kornmueller as follows:

| Competency | Plaintiff | Kornmueller |
|---|---|---|
| Prior Background Experience | 4 | 5 |
| Interpersonal Skills | 3 | 4 |
| Managing Human Resources | 3 | 4 |
| Leads Teams | 3 | 4 |
| Leverages Diversity | 3 | 4 |
| Professional Credibility | 2 | 3 |
| Oral Communication | 2 | 4 |

Following a second interview, in which a scoring system was not used, Diamond chose. Kornmueller.  Diamond has agreed that the hiring process is subjective.

In 2013, Mellon had been on a three-person interview panel for another position (Job Announcement 836334DT).  The panel's non-selection of Plaintiff led to a prior administrative complaint.  Mellon has averred that Plaintiff's prior EEO activity played no role in the creation of her interview notes or the individual rating she gave Plaintiff for her interview in 2018.  Other than noting the fact of the prior EEO activity, Plaintiff has presented no evidence why the averment is false.

Mellon did not discuss her knowledge of Plaintiff's prior EEO activity with any other panel member or the selection official.  She also did not consider Plaintiff's race, sex, or prior EEO activity as a factor when determining her individual rating in 2018.

In his notes of the 2018 interview, Morse wrote Plaintiff was "[n]ot real specific. Answer was general."  He felt another "answer a little vague," and an "[e]xample was a little weak and unspecific."   In oral communication, Plaintiff "did not do a great job providing specifics."  Plaintiff "seemed to have experience but did not do a great job providing specifics or elaborating on examples."  He scored the candidates as follows:

| Competency | Plaintiff | Kornmueller |
|---|---|---|
| Prior Background Experience | 4 | 4 |
| Interpersonal Skills | 3 | 4 |
| Managing Human Resources | 3 | 4 |
| Leads Teams | 3 | 4 |
| Leverages Diversity | 3 | 4 |
| Professional Credibility | 3 | 3 |
| Oral Communication | 2 | 4 |

It is uncontroverted that Morse did not have a work history with Plaintiff, and was not aware that she had engaged in prior EEO activity.  He was also not aware of Plaintiff's race during the selection process.  Morse did not consider Plaintiff's race, sex, or prior EEO activity as a factor when determining his individual ratings.

Chatman wrote in his notes that "[t]his Applicant indicated that they had good oral communication skills but had trouble communicating the topic of the questions."  He assigned the following scores:

| Competency | Plaintiff | Kornmueller |
|---|---|---|
| Prior Background Experience | 4 | 5 |
| Interpersonal Skills | 3 | 5 |
| Managing Human Resources | 3 | 5 |
| Leads Teams | 3 | 4 |
| Leverages Diversity | 3 | 4 |

| | | |
|---|---|---|
| Professional Credibility | 2 | 3 |
| Oral Communication | 2 | 3 |

Chatman was not aware that Plaintiff had engaged in prior EEO activity, and did not consider Plaintiff's race, sex, or prior EEO activity as a factor when determining his individual ratings.

Following the completion of the interview process, the panel members' individual ratings were compiled into a single consensus rating. The panel recommended that the top three candidates by consensus rating score receive further consideration:  Spencer Jones (consensus rating of 29), Karl Kornmueller (28), and Pat Parra (27).  Plaintiff, with a consensus rating of 20, was not among the top three applicants.

Plaintiff does not controvert the sworn statement of Diamond, that in deciding to accept the panel's recommendations, he considered the combined score sheet and the individual panelist notes.  He also did not individually review the resumes of each applicant who was interviewed, and did not consider Plaintiff's race, sex, or prior EEO activity as a factor in his decision.

After a conducting a second round of interviews with the top three candidates, Diamond selected Kornmueller.

**B.     Vacancy -555**

On May 30, 2018, Defendant posted GS-11 Supervisory Archives Specialist positions in Perris, California; Ellenwood, Georgia; and Lee's Summit, Missouri (JD10222555).  Plaintiff applied for the positions in Georgia and Missouri, and was included on the certificate of eligibles for each position.

The interview panels for those two positions were combined, and were comprised of Dayton FRC Directory Chloe (Rena) Reed, Washington Research Service Branch Chief Ivan

Johnson, and Pittsfield FRC Director Anna Lankford.  Johnson is black, Reed and Lankford are white.  The panel interviewed applicants, and ultimately selected Jacqueline Heitz and Mark Blazer, who are both black, as candidates for the two positions.

The individual scores assigned by the panelists to Plaintiff and the two successful candidates are shown in the following table.

### Reed

|                                              | Plaintiff | Blazer | Heitz |
|----------------------------------------------|-----------|--------|-------|
| Prior Background Experience                   | 3         | 4      | 3     |
| Interpersonal Skills                          | 2         | 2      | 2     |
| Managing Human Resources                      | 2         | 2      | 3     |
| Leads Through Change                          | 2         | 3      | 2     |
| Demonstrates Business Savvy                   | 1         | 3      | 1     |
| Promotes a Culture of Ethics & Accountability | 1         | 3      | 3     |
| Leverages Diversity                           | 2         | 3      | 2     |
| Professional Credibility                      | 3         | 3      | 2     |
| Oral Communication                            | 3         | 4      | 3     |

### Johnson

|                                              | Plaintiff | Blazer | Heitz |
|----------------------------------------------|-----------|--------|-------|
| Prior Background Experience                   | 4         | 5      | 3     |
| Interpersonal Skills                          | 3         | 4      | 3     |
| Managing Human Resources                      | 3         | 4      | 3     |
| Leads Through Change                          | 3         | 3      | 4     |
| Demonstrates Business Savvy                   | 1         | 4      | 3     |
| Promotes a Culture of Ethics & Accountability | 2         | 3      | 3     |
| Leverages Diversity                           | 4         | 3      | 3     |
| Professional Credibility                      | 3         | 4      | 3     |
| Oral Communication                            | 3         | 4      | 3     |

### Lankford

|                                              | Plaintiff | Blazer | Heitz |
|----------------------------------------------|-----------|--------|-------|
| Prior Background Experience                   | 4         | 5      | 4     |
| Interpersonal Skills                          | 3         | 3      | 3     |
| Managing Human Resources                      | 2         | 3      | 3     |
| Leads Through Change                          | 2         | 4      | 4     |
| Demonstrates Business Savvy                   | 2         | 4      | 2     |
| Promotes a Culture of Ethics & Accountability | 1         | 4      | 3     |
| Leverages Diversity                           | 3         | 3      | 2     |
| Professional Credibility                      | 3         | 4      | 2     |
| Oral Communication                            | 3         | 4      | 3     |

None of the panelists were aware that Plaintiff had engaged in prior EEO activity, and were not aware of Plaintiff's race. Reed and Langford, the two white panelists, have expressly averred they did not consider Plaintiff's race, sex, or prior EEO activity as a factor when determining individual ratings of Plaintiff

Angela Foster, who is black, was the selecting official for the position in Ellenwood, Georgia. Foster reviewed the combined score sheet, the panelist's individual ratings, and the resumes, and selected Mark Blazer. Blazer had a consensus interview score was 32. Plaintiff's consensus interview score was 22.

Plaintiff does not controvert Foster's statement that in reaching her decision, she did not consider Plaintiff's race, sex, or prior EEO activity

Sean Murphy, who is white, was the selecting official for the position in Lee's Summit, Missouri location. Murphy also reviewed the combined score sheet and panelist's individual notes, and chose Jacqueline Heitz. Heitz had a combined interview score was 25.

Murphy has averred that he did not consider Plaintiff's race, sex, or prior EEO activity when he made his selection decision for Job Announcement No. JD10222555. Plaintiff challenges this fact, but supplies no evidence for the denial other than noting that she had named Murphy in a prior EEO complaint.

Citing Diamond's deposition, Plaintiff asserts that NARA's hiring practices including the interview panel, scoring and selecting process are subject to bias. Again, this does not seem to be a fair description of the actual testimony. Diamond was not asked about hiring practices generally, but about a specific example: whether having a person on a panel who had been named in an EEO administrative action "might leave some room for bias?" Diamond responded, "it is possible," but

that "I trust all three of the panelists."  His testimony thus establishes that bias is a possibility in some instances for individual panelists, but selection of the entire panel is trustworthy.

Plaintiff avers that Defendant has effectively declared she will never be promoted. Defendant notes that in her deposition, Plaintiff described this belief as "a feeling that I have ever since Rose Parisse told me you're not going to get promoted," and because she had asked Hannah Bergman, an agency counsel for NARA, "do you think I'll be promoted?  She said no."

These two comments, Plaintiff testified, "make[] me feel across the board there's something out there, do not promote Volant Harris-Mitchell."

However, Plaintiff's subjective feelings are not supported by evidence of any actual ban on promotions that affected her application for the two job vacancies in 2018.  Plaintiff has acknowledged she has no evidence that Parisse had any involvement at all in  the non-selections for the 2018 positions.

Bergman's comment also does not indicate any general ban on future promotions. Bergman made the comment during the course of a 2014 mediation regarding Plaintiff's then-existing administrative complaints, one in which Plaintiff expressly demanded a promotion as a part of her settlement.  Bergman avers that she was authorized to offer Plaintiff a rating change and other benefits, but not a promotion.  Bergman avers there was never a blanket decision against future promotions for Plaintiff, and that she only told Plaintiff she would not be promoted as a part of her settlement of her 2013 administrative complaints.

## C.    Plaintiff's Experience under Rose Parisse

In 2012 or 2013, Parisse asked Plaintiff if she had a complaint about her.  According to Parisse's deposition, Plaintiff would not answer her, except that at one point she complained about a recent evaluation.

Plaintiff alleges that Parisse resented that she had raised concerns about her performance appraisals, as Parisse felt "why should I have to go through all this for a thousand dollars or whatever."  The cited portion of deposition does not support a conclusion that Parisse actually resented Plaintiff.  She testified that the review of Plaintiff's appraisal required going over a dozen individual evaluations.  Parisse testified that she told Plaintiff, for example, that her bringing candy for other employees was simply not a basis for granting the "outstanding" evaluation Plaintiff wanted on any of the named criteria.  The testimony does not indicate that Parisse complained to Plaintiff about having to review the appraisals with her.

At some unknown date while she was a supervisor at Lenexa FRC, Parisse attended a meeting with union officials.  During the meeting, some union representatives claimed that she and her supervisor, Elaine Christopher, were racist.

Plaintiff alleges Parisse felt Plaintiff should have spoken up to tell the union officers that she was not racist.  The cited authority for this contention,  Parisse's deposition, does not support this claim that Parisse wanted Plaintiff to somehow generally vouch for her or take her side.

Parisse in fact expressly testified what she wanted from Plaintiff "wasn't to defend me, it was to tell the truth" about a specific incident, which apparently arose when Parisse stopped sitting with Plaintiff and another African-American woman, Glenda Jackson, in the lunchroom.  Parisse testified that Plaintiff had previously "told me she was called names because they didn't like her working for me, a white woman, so that was – said that she was an Oreo."  Parisse told Jackson that she would stop sitting with them because "I didn't want them to have any problems from me.  They were welcome to come into my office at any time, but I would not – I didn't want to make things difficult for them."  Parisse was upset that Plaintiff was asked about the incident, but refused to explain what had actually happened.

At some point, Parisse was detailed and reassigned from the Lenexa Records Center.

Parisse has testified that some employees at the Lenexa Records Center believed that the wrong person was targeted, and that several workers emailed her indicating they were angry that she was targeted and the wrong person removed. These employees included Robert Rufo, Cindy Katzer, and Karl Kornmueller.

**D.     The Monkey Photo**

Plaintiff alleges that there was a racially hostile work atmosphere at the Lenexa FRC, and that Defendant was aware that NARA employees were harassed, name-called and cursed other employees. The evidence cited by Plaintiff discusses only the behavior of one employee, Robert Rufo, and does not indicate that supervisors at NARA knew of a hostile environment.

Plaintiff testified her deposition that Rufo placed an image with a monkey "outside my office door above the copier."

Plaintiff's Exhibit Doc. 98-13 is a photograph of the photograph.



The writing attached to the photograph is illegible.  The photograph itself appears to be a picture of a person in a monkey costume.  The exact placement of the photo in relation to either the copier or Plaintiff's office is unclear.  The exhibit photograph suggests the monkey picture may have been posted on some kind of bulletin board.

The Court notes that Plaintiff's testimony on the photo is contradictory.  She testified at one point in her deposition that she knew who placed the photo (Rufo) and that she told FRC Director Elaine Christopher of the photo and that it made her uncomfortable.  Yet elsewhere in her deposition, she responded when asked, "No, I don't know who placed it there," and twice responded "No" when asked if she told Christopher of the photo or that it made her uncomfortable.

Plaintiff testified that Rufo had a practice of posting photographs around the office.  She notes for example that at one point he posted a picture of the head of another worker pasted onto the photo of another person riding a horse.  She also states that "he created a book and took people's pictures and called them names.  I didn't never get the book, it was given to someone when they retired.  Rose Marie Weiz, the former director."

With the exception of the monkey photo, Plaintiff has not explained how any other conduct by Rufo was racially charged or otherwise contributed to a hostile working environment.

Rufo agrees the photo is offensive.

The Response argues that the monkey picture was left up for months.  However, the Response cites only two sources for this contention, Plaintiff's own testimony and the testimony of Rose Parisse.  But the cited portion of Plaintiff's deposition does not address the issue.

In her deposition, Parisse unequivocally testified that never saw the photo: "No.  Never.  I would have — no. Never.  I mean, if that was put on her door?  No."  The issue of how long the photo remained posted is presented only as *an assertion by Plaintiff's counsel*, who asked how

Parisse could have missed the photo "if other employees say that they saw this posting for several months."  Parisse did not respond by agreeing with the question's assumption, but by stating that Plaintiff could and should have removed it herself.

> I would.  Wouldn't you?  If somebody put something on my door, I would — I would just assume I would take it down if I didn't put it there.  Why is this there?  This is stupid. I would have looked at it and said this is stupid.

## E.    The Broom

In 2018, Plaintiff requested brooms to use at the Lenexa FRC.   On July 11, 2018, Management Assistant Darik Schmoe ordered two brooms (Item No. NSN5727349).  This model broom was described in a catalogue as, "Ideal for sweeping small areas. The 3/4" x 30" wooden handled broom has fiber made of 100% un-stitched flagged polypropylene with 6 ½" trim."

On July 18, 2018, a representative from Diltex, Inc. responded to Schmoe, including an invoice for the brooms, Part No. NSN5727349. That invoice included the number 7920015727349 in the Product Description line.

Plaintiff received the brooms on or about August 1, 2018.  One of the brooms is shown in the following photograph.



Plaintiff then emailed Diamond, "I don't like these brooms they look like witches brooms, we do need short brooms, but different from what we have now."

Diamond believed the incident was humorous.   The same day, August 1, 2018, he forwarded Plaintiff's request to Schmoe, asking whether the brooms could be sent back. Schmoe contacted Plaintiff to arrange for the return of the brooms and box.

On August 6, 2018, a representative from Diltex, Inc. provided Schmoe a return authorization and address for the two brooms.

Both Schmoe and Diamond have averred that they did not intend to provide Plaintiff with a witch-like broom.  It is uncontroverted that both acted promptly to return the item to the manufacturer when Plaintiff expressed a concern.

Plaintiff complains that the broom package had been opened, but has also admitted that supplies coming in to the FRC are typically opened by a supply officer.

## F.      Overtime and Timecard

Plaintiff contends that her timecard inaccurately showed her overtime work.  She further alleges that, despite prompting, Diamond failed to confirm an amendment to her time record.

Plaintiff cites Diamond's deposition to support this allegation, but in the cited portion of the testimony, he was asked "whether this amendment that you directed Darik Schmoe to complete on January the eighth and January the twenty-second fixed the issue of Mrs. Mitchell's overtime hours?"  He responded, "Yes.  It would have because an amendment would have changed her time and taken those hours away."

Diamond testified that if an employee signs up for overtime on a weekend at the end of a pay period, that the overtime must be certified no later than last Friday of the pay period, even if the overtime had not yet been worked.  He further clarified that if an employee does not work their scheduled overtime assignment, then an amendment to their timecard must be processed. Diamond explained that on each instance when Plaintiff had informed him that she did not work her scheduled overtime, he made sure that an amendment was drafted and certified.

Plaintiff also complains Diamond did not directly respond to four emails which she sent about the issue.  Diamond testified in his December 2021 deposition that he did not realize until then that he had not responded to her request.

G.      **November 2018 Verbal Counseling**

On November 6, 2018, Diamond sent an electronic meeting invitation for 1:00 p.m. November 13, 2018 to Plaintiff and a group of other supervisors and non-management officials at the Lenexa FRC. Diamond set this meeting to discuss the Lenexa FRC action plan, and to plan facility-wide action items for the fiscal year.

Plaintiff's performance is rated on an annual basis with regard to several critical elements. One such element is Critical Element #2, Workplace Culture and Morale.

As the purpose of the meeting was to focus on efforts to improve workplace culture and morale, Diamond expected his supervisors to attend the meeting, and viewed work on the action plan as important to fulfilling Critical Element #2 on their performance plans.

Plaintiff was not present at the start of the meeting.  Following the meeting Mr. Diamond spoke with Plaintiff and verbally counseled her that timely attendance at meetings such as this one was an important factor with respect to Critical Element #2.

Plaintiff states that she was late for the meeting because she was on a telephone call with a customer.  She also contends that she was also disciplined at the hearing itself, and that when she was on the way to the meeting she saw another worker, Randy Kelly, in his office and did not attend the meeting.

However, in her deposition she testified only that Diamond asked to see her after the meeting, and indeed expressly agreed that description of the discussion that she "found to be problematic" was the one which she had "afterwards"—after the group meeting.  Further, Plaintiff's allegation also directly contradicts the 2019 affidavit she filed in connection with her administrative complaint, in which she wrote:

David said to me *after everyone else had vacated the room*, November 13, 2018, in his words, "This is the second time I had to call you to remind you of the meeting." I replied, "David I knew about the meeting but I had received a very important phone call from a few agencies." David replied back, "but what it looks like to other employees is that you are trying to avoid attending the meetings." David then said, "this is part of your Critical Element II of your Annual Appraisal" and confirmed that "Randall Kelly informed me [David Diamond] that he would not be attending the meeting I [David Diamond] scheduled."

(Emphasis added).

There is a factual dispute whether Plaintiff called Dave Diamond before the meeting to say she would not be on time. She has now averred she did. As set out earlier, her 2019 affidavit suggests she did not seek to excuse her absence until later. Even by the more recent averment, it appears that Plaintiff did not seek to excuse her absence until after she was on the phone call. Diamond contends Plaintiff did not seek permission, and in any event her attendance for the full meeting was still required.

Plaintiff contends that Diamond "lied" when he completed an affidavit over the incident for an EEO investigator. In the affidavit, Diamond wrote that Plaintiff was "absent" from the meeting. He agreed in this deposition that he meant to say that Plaintiff was not present for the start of the meeting, but did arrive before its end.

It is uncontroverted that, beyond the verbal counseling, Diamond did not discipline Plaintiff or lower her performance rating as a result of the incident.

From 2015 to 2020, Plaintiff received an "outstanding"—the highest possible performance rating—on her yearly performance appraisals.

## H.    Evidence as to Trainer, Diamond, and Kornmueller

Jay Trainer has served as Executive for Agency Services at NARA since 2013, and oversees the FRC. He attended a 2018 all-hands meeting at the Lenexa FRC in 2018, in which

Rufo demanded to know when NARA and Trainer would investigate the removal of Parisse, which he believed was unjustified.

Trainer was aware of the complaints made by union representative Ken West against Parisse.  His understanding was that there was not a "positive vibe" regarding Parisse.   By the time of the 2018 job vacancies, Parisse had been reassigned from the Lenexa FRC.

Plaintiff complains that Trainer failed to investigate Rufo, but the cited testimony indicates only that Trainer at some point received a "complaint about him having kind of a temper."  He does not indicate he had received complaints of a hostile environment at Lenexa, and specifically denies having knowledge of the actual conditions there.

Trainer does not believe that an employee having a temper by itself poses a workplace safety concern.

In his deposition, Trainer was asked if he agreed with the conclusions of a 2021 NARA Task Force Report rendered in the wake of the death of George Floyd:

> Racism is embedded in the history and current practices of NARA. Dismantling such structural racism will require vast changes to NARA's work culture at every level as well as an ongoing and active commitment to anti-racist work throughout the agency's future. By creating a work culture that is diverse, equitable, accessible, and inclusive, NARA will be better prepared to welcome and engage historically marginalized, underserved and diverse populations. We look forward to the next phase of translating these recommendations into action.

He responded that he agreed, but also stated also stated he believes minorities may still advance at NARA and that the Report was "trying to inspire such advancements."   He was again asked if he agreed that "racism is embedded" at NARA, and he responded, "In the history. Yes."

In 2017 and 2018, Diamond as a selecting officer chose white candidates for positions GS-5 to GS-7.  Plaintiff has supplied no evidence as to what the races of alternative candidates, or what their scores might have been.

Diamond has agreed it "would be a benefit" for a candidate "who can ultimately do more training" than another candidate. Diamond does not know whether Kornmueller later needed additional training.

As to whether the broom was retaliation, Diamond testified that he "did not think that was a very plausible outcome because of the way items are ordered." He believes the broom was a vendor error.

Diamond has not personally taken any steps to implement the long-term and short-term goals identified in the Task Force on Racism. He has not personally hired any African American employee above a GS-9 position, and agrees that blindly accepting interview scores can lead to bias and retaliation.

In her Response, Plaintiff claims that Kornmueller is an unfair supervisor who "targets non-white employees." The Response cites Plaintiff's deposition, in which she states that "[i]t seems that the non-white employees sometimes are targeted by Karl." Plaintiff only names one employee (Landon Moore) who she believes was essential in helping the unit during the Covid-19 crisis. She testified Kornmueller "tried to write him up, tried to get rid of him." Plaintiff has no information as to any rationale Kornmueller may have had for believing Moore required discipline.

## I.    Relevant Administrative Complaints

On April 4, 2013, Plaintiff contacted the NARA EEO office complaining of discrimination based on her race, color, sex, and reprisal. On May 30, 2013, she filed a Formal Complaint of Discrimination regarding her April 4, 2013 initial contact, which was accepted by NARA as Administrative Case No. 1319LX. Plaintiff asserted that Mellon participated in an interview panel which resulted in a discriminatory non-selection.

In addition, Plaintiff also alleged that, in the spring of 2013, she was discriminated against when another worker hung the picture of a monkey outside of her office.  Plaintiff testified in her deposition that she did not know who hung the picture.

On September 1, 2016, EEOC Administrative Judge Kendra. R. Howard issued a decision without a hearing, finding that Plaintiff had not established a prima facie case of discrimination with respect to her complaints. On September 27, 2016, NARA issued a Final Order regarding the Complaint of Discrimination in Agency Case No. 1319LX, adopting the Administrative Judge's findings and conclusions in full.

The EEOC's Office of Federal Operations issued a decision affirming NARA's Final Order on March 5, 2019.

On July 26, 2019, the EEOC's Office of Federal Operations issued a Decision on Request for Reconsideration, declining to revisit the March 5, 2019 decision.

Plaintiff's allegations of discrimination against Mellon and those regarding a 2013 picture of a monkey did not result in a finding of discrimination at the administrative level.

On May 23, 2018, Plaintiff filed a Formal Complaint of Discrimination which included allegations of discriminatory non-selections in Vacancy Announcements -395 and -555, allegations regarding a witch-like broom, and her allegations regarding a November 2018 verbal counseling. NARA issued a Final Order finding that Plaintiff did not suffer discrimination with respect to these issues on September 9, 2020.

Plaintiff filed the current lawsuit on December 8, 2020.

## II.      Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[3]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[4]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[5]  The nonmovant must then bring forth specific facts showing a genuine issue for trial.[6]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[7]  The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[8]

The Court notes that numerous facts alleged by Plaintiff in the course of her Statement of Additional Uncontroverted Facts are not supported in the cited evidentiary record.  Many of these are not included in the Court's factual findings.  The Court also excludes factual claims which are

---

[3] Fed. R. Civ. P. 56(a).

[4] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citation omitted), *abrogation on other grounds recognized by Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012).

[5] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[6] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[7] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998)).

[8] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

asserted at scattered places in the argument portion of her brief, but are wholly absent from the factual statement required by Local Rule.[9]

### III.    Analysis

To establish a prima facie case of race or sex discrimination or retaliation, a plaintiff must show that (1) she belongs to a protected class  or engaged in protected opposition; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination or retaliation.[10]   If a plaintiff demonstrates a prima facie violation of Title VII, "the defendant may come forward with a legitimate, non-discriminatory or non-retaliatory rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual."[11]

### A.    Hostile Work Environment

"Title VII does not establish a general civility code for the workplace," and the statute is not violated by "the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces."[12]   A plaintiff presents a prima facie case of hostile work environment by showing "a genuine dispute of material fact as to whether the workplace is permeated with

---

[9] D. Kan. R. 56.1(b)(1) requires that a party opposing summary judgment present "a section containing a concise statement of material facts as to  which the party contends a genuine issue exists."  If presenting additional facts, the party must do so by "separately numbered paragraph, supported by references to the record, in the manner required by subsection (a),above" — that is, by a separate and concise factual statement.

[10] *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011).

[11] *Crowe v. ADT Sec. Servs., Inc*., 649 F.3d 1189, 1195 (10th Cir. 2011).

[12] *Lounds v. Lincare, Inc*., 812 F.3d 1208, 1222 (10th Cir. 2015) (internal quotation and citation omitted).

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment."[13]  The Plaintiff must show:

> (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on [race]; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.[14]

In responding to Defendant's motion, Plaintiff argues that "[s]ince 2010, the Federal Records Center has been plagued with at least one specific problem—racism."  She supports this claim by focusing on conflicts she had with FRC Lenexa Director Rose Parisse, the posting of the monkey photo, the broom incident, her verbal counseling by Diamond over meeting attendance, and social media postings by NARA employees.

The Court finds that Plaintiff has failed to show the existence of a hostile working environment.  Parisse left FRC Lenexa in 2013.  Notwithstanding her attempt to now reference incidents extending back to 2010, Plaintiff was asked at the Pretrial Conference whether she was making independent claims for earlier non-selections, "[a]nd, if so, would those be time barred?"  Plaintiff responded she was not making any independent claim for that period, as "I do believe that it would be time barred."  The Magistrate Judge allowed reference to events prior to 2018 as potentially "relevant background material to [Plaintiff's] retaliation claim."  But the Magistrate Judge expressly granted Defendant's motion to limit the harassment claim, stating "I do not see a basis to proceed on the alleged harassment go[ing] back to 2013."

---

[13] *Id.* (internal quotation and citation omitted).

[14] *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir.2007) (second alteration in original) (quoting *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1262 (10th Cir.2005)).

The Court agrees.  Plaintiff's claims in the present action, which focus on events at the Lenexa FRC in 2018, involve events some five years after whatever may have occurred during Parisse's tenure there.  The events in 2013 are substantially removed in time from the 2018 non-selections, and occurred under different supervisors.  Plaintiff has shown nothing in the way of potential racial harassment during the intervening half decade.

The Court agrees that the monkey photo is offensive.  It is, in fact, deeply abhorrent.  But it also a single incident which happened in 2013, five years before Plaintiff's non-selection for Vacancies -359 and -555.  The only events occurring during the relevant time period are the broom incident, the counseling over attending a meeting late, and the social media postings.

The Court finds the broom incident did not create a hostile work environment.  The Court assumes, for purposes of the present Order, that Plaintiff wanted a replacement broom because she subjectively felt the broom looked like a "witch's broom."  But Plaintiff has supplied no evidence which would suggest a reasonable person would view the broom as a "witch's broom."  It was not described as such by office supply company that provided it.  The broom shares none of the features of a witch's broom in classic folklore.   Such brooms are typically homemade, preindustrial constructions in which a cone of straw is bound by a cord or rope to a crooked, unfinished wooden post. The broom delivered to Plaintiff has a modern, minimalist version of the classical broom.  It shares none of the features of the classical witch's broom,[15] beyond the fact that it is, indeed, a broom.

---

[15] The following images, respectively, are from J. Leyendecker, THE SATURDAY EVENING POST, front cover (Oct. 27, 1923); Dorothy Lathrop, illustration for WALTER DE LA MARE, DOWN-ADOWN-DERRY:  A BOOK OF FAIRY POEMS, at 79 (Holt  1922); J. Byam Shaw, OLD KING COLE'S BOOK OF NURSERY RHYMES (Evans, 1901); J.C. Armyntage, ill. for Walter Scott, LETTERS ON DEMONOLOGY AND WITCHCRAFT, xiii (Tegg & Co. 1840); Margaret Hamilton, The Wizard of Oz (MGM Studios 1939).








Even assuming that the broom was a "witch's broom," it has no obvious racial element. Plaintiff cites two authorities[16] as reflecting the many "historical references of African American enslaved women who were regarded as witches."  In fact, both authorities refer to a single event and the experience of one individual woman, Tituba, whose accusations commenced the Salem witch trials.[17]  The first of the authorities cited by the Response acknowledges that the story of Tituba is "potentially fictitious" and "hard to untangle . . . from a distance."[18]  Contrary to the assertion in the

---

[16] Erin Blakemore, *The Mysterious Enslaved Woman Who Sparked Salem's Witch Hunt*, HISTORY.COM (July 17, 2018) (available at www.history.com/news/salem-witch-trials-first-accused-woman-slave); Timothy McMillan, *Black Magic: Witchcraft, Race, and Resistance in Colonial New England*, 25 J. BLACK STUD. 99 (1994).

[17] Blakemore, at 1.  The Response, perhaps mistakenly, obscures this limitation by misquoting the title of Blakemore's article as "The Mysterious Enslaved *Women* Who Sparked Salem's Witch Hunt."

[18] *Id*.

Response, Tituba was "likely an Indigenous Central American," rather than an African American.[19] Far more importantly, neither authority lends support for a broad popular association of black women and witches.  Further, it does not appear that Plaintiff made that association at the time — her complaint at the time of the  2018 incident was about the broom's appearance, not that it reflected racial harassment.  Plaintiff makes no allegation that, at the time of the incident, she was aware of historical research regarding the Salem witch trials.

Plaintiff argues that a hostile environment is demonstrated by the verbal counseling she received when she was late for a scheduled meeting, while a white colleague was not disciplined. But the uncontroverted evidence establishes that the two employees were not similarly situated. The colleague obtained prior permission to not attend the scheduled meeting.  Plaintiff's own testimony indicates that she did not obtain such permission before the meeting, she reportedly indicated she could not attend the meeting because she was then on a client telephone call.  More importantly, it is also uncontroverted that the counseling did not otherwise affect the terms or conditions of Plaintiff's employment.  Diamond continued to give her "Outstanding" job ratings.

Finally, in support of her claim of a hostile work environment, Plaintiff's Response points to various social media postings attributed to Rose Parisse.  However, Plaintiff immediately caveats that she "does not suggest that the Facebooks rantings altered the conditions of her employment," but asserts that they "provide insight about nature of her work environment [sic]."[20]

As to this "insight," Plaintiff does not assist the Court by providing a detailed discussion of the actual posts; she simply points to an exhibit containing an undifferentiated mass of

---

[19] *Id.  See also* Chadwick Hansen, *The Metamorphosis of Tituba, or Why American Intellectuals Can't tell An Indian Witch from a Negro*, 47 THE NEW ENGLAND Q. 3 (1974),  (identifying Tituba as "a Carib Indian woman").

[20] Resp. at 26-27.

unauthenticated Facebook posts.  Further, none of the posts appear to have been made by Parisse herself, but by other NARA employees who were apparently in the same Facebook friends group as Parisse.

One post asks for a like-and-share if a viewer believes Melania Trump rather than Michelle Obama should be the Most Admired Woman of the Year.  Other posts are a photograph of Joe Biden photoshopped onto a package of Hostess Ding Dongs; an expression disagreement with the expansion of voting by mail; a disagreement with foreign policy decisions by Presidents Clinton and Obama and by Secretary of State Hillary Clinton; a complaint the news media was not covering the recent primary election victories of black Republican candidates; and an expression of support for conservative black commentator Candace Owens.  A post from 2018 has a picture of Donald and Melania Trump and states, "I love my first family!"

These posts are partisan and political.  Plaintiff provides no argument or evidence that they are racist.  Plaintiff provides no reason to believe that these postings affected her actual work environment in any way at all.  Further, Plaintiff does not assert that she was aware of these postings at all prior to the filing of the present lawsuit.  Plaintiff apparently reviewed Facebook postings of various current or former NARA employees at some point in 2020.  Again, Parisse left the Lenexa FRC in 2013.

The Court finds Plaintiff has failed to show that she was subjected to unwelcome harassment based on race during the relevant time period, or to show that the harassment was so severe or pervasive as to alter a term or condition of her employment.

## B.     Retaliation

To establish her prima facie case of retaliation, Plaintiff must demonstrate that "(1) [s]he engaged in protected activity; (2) [s]he suffered an adverse employment action; and (3) there is a

causal connection between [her] protected activity and the adverse employment action."[21]   With respect to the second element, Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[22]

The third element, causation, requires "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[23]   "However, unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation."[24]

Plaintiff argues Defendant retaliated against her for her prior EEO complaints by not selecting her for Job Announcements -395 and -555 in 2018, and in the verbal counseling she received by Diamond in November.

The Court grants summary judgment on these claims.  Plaintiff has supplied no evidence which would support an inference that her employment was adversely affected because of retaliation for prior EEO activity.  The Court discusses Plaintiff's non-selection for the two positions in 2018 more extensively below, but for now it is sufficient to note that, of the six NARA supervisors who reviewed the applicants for the two positions, only one, Mellon, was aware of Plaintiff's EEO activity.

---

[21] *Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014) (citation omitted).

[22] *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

[23] *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (citation and internal quotations omitted).

[24] *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10t5h Cir. 1997)) (emphasis in original).

Although Plaintiff's earlier EEO activity had yet to be administratively resolved (it was ultimately found to be without merit), the investigative phase had ended in 2015. Accordingly, by the time Mellon served on the first of the two panels, she would only have been aware that Plaintiff had advanced an EEO complaint which had resulted in an investigation some two years previously. There is no evidence that any of the other panelists knew of any of Plaintiff's prior EEO activity, and Mellon's scoring of Plaintiff were consistent with those of the other panelists.

Plaintiff notes that she also filed a new complaint in 2018. But there is no evidence that any of the panelists at all were aware of this activity. This leaves the verbal counseling by Diamond in 2018 as potential retaliation. Diamond counseled Plaintiff as to her meeting attendance, but the evidence is uncontroverted that this did not have otherwise have any affect on the conditions of Plaintiff's employment. Diamond continued to give Plaintiff the highest possible job rating, "Outstanding."

The Court finds plaintiff has failed to present a prima facie case of retaliation by showing that she suffered a materially adverse job impact which, by reasonable inference, was caused her participation in protected activity.

C.     **Disparate Impact**

Plaintiff alleges she was injured through Defendant's disparate impact on employees based on race and sex. Although some of Plaintiff's prior administrative actions have raised claims of discrimination based on color or age, the present disparate impact claim does not advance such allegations.

In addition to intentional discrimination, Title VII prohibits "practices that are fair in form, but discriminatory in operation."[25]  Disparate impact cases encourage "the removal of employment obstacles, not required by business necessity, which create built-in headwinds and freeze out protected groups from job opportunities and advancement."[26]

> Statistical evidence is an acceptable, and common, means of proving disparate impact. In determining whether [a plaintiff]'s statistical evidence is sufficiently reliable to make a prima facie case, we are concerned with three issues: (1) the size of the disparity between [favored and disfavored populations]; (2) the statistical significance of the disparity, measured by standard error rate or standard deviation; and (3) whether the statistical evidence effectively isolates the challenged employment practice.[27]

An individual plaintiff asserting a claim for disparate impact must show the challenged practice affected her personally.  "It is not sufficient for an individual plaintiff to show that the employer followed a discriminatory policy without also showing that plaintiff [her]self was injured.[28]

Here, Plaintiff has supplied no direct statistical evidence of racism or sexism in employment decision affecting her employment.  She has identified no expert witness to present such evidence.  Instead, she points to deposition testimony indicating that Murphy and Diamond have, she alleges, "predominantly' hired white employees, but otherwise relies entirely of the Report of the Archivist Task Force on Racism

With respect to the prior hiring by Murphy and Diamond, Plaintiff supplies no evidence at all for the individual positions involved, or the racial composition of the selection pool.  Plaintiff makes no attempt to quantify any actual racial disparity in hiring by those supervisors, or

---

[25] *Lewis v. City of Chicago*, 560 U.S. 205, 211 (2010).

[26] *Tabor v. Hilti, Inc*., 703 F.3d 1206, 122) (10th Cir. 2013) (quoting *EEOC v. Joe's Stone Crab, Inc*., 220 F.3d 1263, 1274 (11th Cir. 2000)).

[27] *Id*. at 1222 (internal quotation omitted).

[28] *Coe v. Yellow Freight Sys., Inc*., 646 F.2d 444, 451 (10th Cir. 1981).

otherwise provide statistics sufficient to create a prima facie case of disparate impact based on the prior history of Murphy and Diamond.

More generally, Plaintiff relies on the NARA Task Force Report.  Plaintiff argues that black workers are disproportionately represented in positions below GS-9 for example, and alleges that black employees at NARA face structural burdens in the form of a lack of mentoring and the way job vacancies are opened and reopened.  She alleges, for example, that black men and women represent only 11.73% and 16.84% "of the workforce" at NARA, while white men and women represent 34.29% and 28.65%, respectively.

Counsel for Plaintiff does not discuss the specific findings of the Task Force Report during the course of her extensive Statement of Uncontroverted Facts, as required by local rule.   During the course of the argument portion of her brief, she cites with specificity only three of the 105 pages in the Report (pages 8, 13, and 23).  None of these passages actually sets forth in any detail statistical imbalances in the NARA workforce.

A survey of the Task Force Report does not provide support for Plaintiff's disparate impact claim.  The document does state that "[t]here is a disproportionate number of BIPOC [Black, Indigenous, and People of Color] in GS-9 and below," but the disparity is not quantified, and the disparity is cited as an "Issue/Concern submitted by Staff" rather than a finding, nor is the imbalance linked to any particular structural barrier.[29]  The Report itself expressly states that for government agencies, "statistics are only the starting point of the barrier analysis process," which individual agencies must then proceed to undertake.[30]

---

[29] Report to the Archivist, The Archivist's Task Force on Racism, at 51 (National Archives, April 20, 2021).

[30] *Id*. at 35.

At various places, the Task Force Report cross-references NARA's 2020 EEO submission, Program Status Report Management Directive (MD)-715, Fiscal Year 2020.[31]  But even this falls short of admissible statistical evidence of disparate impact.  The MD-715 Report does contain the 11.73% and 16.85%  figures cited by Plaintiff, for example. It notes the disparity with white participation—but this is not cited as a statistically significant distinction for, as plaintiff would have it, the NARA workforce generally, but a disparity in "the SES population," that is in the Senior Executive Service, which is generally identified as Grades GS-15 and above.  Further, this imbalance is cited as a condition that serves as "a Trigger for a *Potential* Barrier."[32]  That is, the MD-715 Report, like the Task Force Report, simply focuses on statistical imbalances for administrative purposes, as a starting point for further inquiry by the agency.  Neither report is evidence of a statistically significant racial imbalance in hiring or promotion, linked to a specific barrier to advancement, which worked to Plaintiff's injury.

Even assuming some disparity in advancement at NARA, either for race or sex, Plaintiff has not attempted to identify evidence of the statistical significance of the disparity, measured by standard error rate or standard deviation.  Nor has she, with admissible evidence, shown whether the statistical evidence effectively isolates a challenged employment practice.

It is not for the Court to pour through the record to finds support for a party's contentions; the Rules of the Court require a party to cite with particularly evidence in the record.  The Plaintiff's brief fails to meet these standards, and the Court finds her disparate impact claim should be dismissed.

---

[31] Available at https://www.archives.gov/files/fy2020-md-715-final-report.pdf.

[32] *Id*. at 55 (emphasis added).

## D.     Disparate Treatment

To state a Title VII disparate treatment claim based on sex or race, Plaintiff must provide evidence capable of supporting a finding or inference that (1) she belongs to a protected class, (2) she sustained an adverse employment action, and (3) the circumstances give rise to an inference of discrimination based on race or sex.[33]   Discrimination may be inferred by a showing that a defendant treated a worker differently from other, similarly situated employees.[34]   Or an inference may be drawn from "actions or remarks made by decisionmakers that could be viewed as reflecting discriminatory animus, statistical data displaying an employer's pattern of discrimination toward a protected class or the timing of events leading up to an adverse action."[35]   "The real question, it must be remembered, is whether a plaintiff has shown actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act."[36]

Here, Plaintiff has failed to present evidence which would create a reasonable inference that her non-selection for Job Vacancies -555 and -395 was due to race or sex.   In the case of Vacancy -555, the selection panel gave higher scores to Mark Blazer and Jacqueline Heitz for the two open positions.   Both Blazer and Heitz are black.

---

[33] *See Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021).

[34] *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005) ("such proof is just one sufficient means" to satisfy third prima facie prong). Articulation of plaintiff's prima facie case may vary depending on "the context of the claim and the nature of the adverse employment action alleged." *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005).

[35] *Owens v. Unified Gov't of Wyandotte Cty./Kansas City, Kan.*, 2022 WL 2131117, at *9 (D. Kan. 2022) (internal quotations and citations omitted).

[36] *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002) (internal quotation and citation omitted).

Plaintiff has offered no basis for inferring that her non-selection for Vacancy -395 was because of her race.  There is no evidence of any racially discriminatory intent by the selection panelists Mellon, Morse, or Chatman.  The panelists' scores were generally similar, and all judged the Kornmueller as a better candidate than Plaintiff on all seven of the selection criteria (with one exception, Morse giving both candidates the same score on one criteria).  Kornmueller and the other two candidates who advanced to a second interview received scores of 29, 28, and 27.  The panel assigned Plaintiff a score of 20.

The Court concludes that Plaintiff has failed to present evidence giving rise to an inference that her non-selection was due to discrimination.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 87) is hereby **GRANTED**.

**IT IS SO ORDERED**.

This Order closes the case.

Dated this 17th day of August, 2022.


ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE